UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

WHITE PLAINS DIVISION

-----------------------------------------------------------------X

WAYNE JEFFERS,

   Plaintiff,

   -against-      Case No.: _____ 25 CV 09950

MARIE THERESE DOMINGUEZ,

in her individual capacity,

   Defendant.

-----------------------------------------------------------------X

**COMPLAINT**

(Civil Rights, Fraud, and Breach of Contract)

**Jury Trial Demanded**

## I. INTRODUCTION

1. This is an action brought by Plaintiff Wayne Jeffers to redress the wrongful denial of rights and contractual entitlements arising from his former company, Barrier Motor Fuels, Inc., which operated the southbound and northbound service area on the Saw Mill River Parkway ("site" or "sites") between Farragut Parkway and Tompkins Avenue in Hastings-on-Hudson, New York 10607.

2. Despite full compliance with lease terms, including monthly payments totally $53,170,00 and preservation requirements the New York State Department of Transportation ("NYSDOT") denied issuance of the necessary Highway Work Permit.

3. This conduct violated Plaintiff's due process and property rights under 42 U.S.C. § 1983, constituted fraud and misrepresentation, and breached the State's contractual obligations.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, as Plaintiff asserts claims arising under federal civil rights law.

5. Venue is proper in the Southern District of New York, White Plains Division, because the events giving rise to this claim occurred in Westchester County, New York.

## III. PARTIES

6. Plaintiff: Wayne Jeffers, former principal of *Barrier Motor Fuels, Inc.*, a business that operated the Saw Mill River Parkway sites. Plaintiff brings this action in his individual capacity to seek relief arising from the losses suffered due to NYSDOT's actions and misrepresentations.

7. Defendant: Marie Therese Dominguez, Commissioner of the New York State Department of Transportation, sued in her individual capacity.

## IV. FACTUAL ALLEGATIONS

8. Barrier Motor Fuels, Inc. entered into a lease agreement with the NYSDOT for the Saw Mill River Parkway property and was signed by the New York Stare Comptroller on March 24, 1994 and continuing for twenty years with two five year options.

9. Barrier complied with all lease, environmental, engineering, and historic-preservation requirements including total rental payments of $53,160.00.

10. Despite compliance, NYSDOT denied issuance of the Highway Work Permit, preventing restoration and operation.

11. The property was eligible for the National Register of Historic Places, but NYSDOT allowed it to deteriorate and overgrow. Exhibit Photo 1.

11a. The southbound service area structure on the Saw Mill River Parkway still exists, though substantially damaged and deteriorated. NYSDOT is aware of ongoing violations of the Historic Preservation Act, including failure to maintain the property and prevent further degradation. These conditions have caused public health and safety concerns, including infestations of rodents and other vermin, creating a harmful environment for the surrounding community. Exhibit Photo 2. And Exhibit Photo 3.

12. NYSDOT official Joseph H. Boardman misrepresented community opposition, despite internal communications showing over 90% community support.

13. Plaintiff was coerced into settling litigation in 2001 for $2.9 million, under duress and false assurances.

14. Plaintiff now seeks to reopen the case, based on fraud, misrepresentation, and new evidence.

15. Equitable tolling applies due to concealment and ongoing misconduct by NYSDOT officials.

16. On August 19, 1999, forensic accountant Walter Zweifler concluded that total financial damages sustained by Barrier Motor Fuels, Inc. were Forty Four Million Five Hundred and Fifteen Thousand and no/100 Dollars ($44,515,000.00) suffered by Plaintiff as principal. The ongoing neglect and deterioration of the southbound service area, including infestations and environmental hazards—have further compounded the harm, both financially and to the surrounding community.

17. Barrier Motor Fuels, Inc. ultimately ceased operations September 30, 2014, due to bankruptcy, customer loss, and failure to pay certain taxes. Plaintiff continues to assert claims arising from prior misconduct.

18. The original lease held by Barrier Motor Fuels, Inc. was a bankable asset, which was used as collateral by Sun Oil Company in a $1,700,000 loan agreement. Plaintiff alleges that multiple NYSDOT officials and employees conspired to misappropriate or "steal" the lease, thereby depriving Plaintiff and Barrier Motor Fuels of its lawful value. These actions were deliberate, coordinated, and fraudulent, and constitute a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968.

## V. CAUSES OF ACTION

### Count I – Violation of Civil Rights (42 U.S.C. § 1983)

19. Defendant's actions deprived Plaintiff of property without due process and equal protection under the law.

### Count II – Fraud and Misrepresentation

20. Defendant, through NYSDOT officials, knowingly misrepresented community support and lease compliance, causing financial and reputational harm to Plaintiff.

### Count III – Breach of Contract and Implied Covenant of Good Faith

21. Defendant breached the lease agreement and acted in bad faith by denying permits and allowing the property to deteriorate.

### Count IV – Violation of RICO (18 U.S.C. §§ 1961–1968)

22. Plaintiff incorporates all prior paragraphs as if fully set forth herein.
23. The actions of NYSDOT officials and employees, including misappropriation of a bankable lease, conspiracy to defraud Plaintiff and Barrier Motor Fuels, and coordination in furtherance of unlawful acts, constitute a pattern of racketeering activities.
24. As a result, Plaintiff has suffered significant financial harm, including the loss of the lease's collateral value and compounded damage from ongoing deprivation.

## VI. PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court:

1. Declare that Defendant's actions violated Plaintiff's constitutional and contractual rights;
2. Order appropriate injunctive and declaratory relief, including immediate remedial action to address ongoing violations of the Historic Preservation Act, prevent further structural deterioration, and mitigate public health hazards;

3. Reinstate the original lease for *Barrier Motor Fuels, Inc.*, and direct that the company be allowed to rebuild and restore the southbound service area to its original specifications;

4. Grant leave to amend this Complaint following discovery;

5. Award costs, attorney's fees, and such other just relief as the Court deems proper; and

6. Award compensatory damages in the amount of Forty Four Million Five Hundred and Fifteen Thousand and no/100 Dollars ($44,515,000.00) reflecting losses incurred by Barrier Motor Fuels, Inc. and suffered by Plaintiff personally, together with interest and additional equitable relief the Court deems just and proper, including consideration of compounding damages from ongoing deterioration.

## VII. EXHIBITS

- **Exhibit A** – Public Support Correspondence: community, organizational, and expert letters reflecting support for Barrier Motor Fuels' rehabilitation and preservation of the Parkway site.

- **Exhibit B** – Forensic Accounting Report (Walter Zweifler, Aug. 19, 1999): assessing total financial damages of $44,515,000.00. Report will be produced in discovery.

## VIII. CERTIFICATION AND SIGNATURE

I, Wayne Jeffers, certify that all factual allegations and attached exhibits are true and accurate to the best of my knowledge.

Dated: DECEMBER 1, 2025
White Plains, New York

*Wayne Jeffers* *Wayne Jeffers*

**Wayne Jeffers**
Plaintiff, Pro Se

 

Photos Exhibit: 1 NYSDOT allowed it to deteriorate and overgrow.

 

Photos Exhibit: 2 These conditions have caused public health and safety concerns, including infestations of rodents and other vermin

 

Photos Exhibit: 3 The Dot allowed a harmful and dangerous environment to the surrounding community and public at large, including the Homeless. The graffiti proves the presence of deadly rotted beams over where our likely young artists from the neighborhood stood. I am a Fireman and first responder for 54 years, sites like this can expect an incident.

- **Exhibit A** – Public Support Correspondence: community, organizational, and expert letters reflecting support for Barrier Motor Fuels' rehabilitation and preservation of the Parkway site. This eleven page exhibit from a previous Federal Complaint will articulate the characters of this complicated conspiracy to tortiously interfere with Barrier lease with the NYS DOT and where actors conspired to break the law.

---

The Arbitrary and Capricious Breach by the Department

65. During January and February of 1997, Mike Foley, the owner of a local Amoco station – whose business interests were adverse to plaintiff's because of Foley's perception that the opening of the subject stations on the Saw Mill River Parkway would affect his service station – actively fomented public sentiment against the proposed reopening of the abandoned stations by releasing false information; specifically by characterizing the proposal both as a "megaplex" and an environmental threat.

66. As a result of Mr. Foley's activities, pressure was

brought upon local officials of the Village of Hastings-on-Hudson to have an "informational meeting". Said meeting was held on February 27, 1997 and attended by both New York State Senator Spano and Assemblyman Brodsky. It should be noted that in a document obtained from the defendant State of New York, it is noted by a unknown Department of Transportation official that either Mr. Brodsky or Mr. Spano did not want any representative of Barrier invited to this meeting. [See Exhibit "5" attached hereto]

67. At said meeting, Bauman, then Regional Director for the Department, stated that the plans for the renovation and reopening of the aforementioned service stations on either side of the Saw Mill River Parkway were "cut and dried." [See February 28, 1997 Gannett Newspaper Article entitled "Gas Stations to be reopened despite resident's concerns" attached hereto as Exhibit "6"]

68. Furthermore, it must be noted that at this time local officials from the Village of Hastings-on-Hudson began adamantly denying knowledge of the Department's earlier plans for the subject sites even though as will be shown below, it is clear that these village officials, Village Manager Neil Hess, the mayor, and others clearly had been aware of the same for several years prior to this meeting. [See also, Bauman Memorandum noted below and Examination Before Trial Transcript of Albert J. Bauman, former Regional Director of the New York

Department of Transportation, pg. 84, attached hereto as Exhibit "7"]

69. On or about March 19, 1997, Bauman drafted a memorandum to defendant Boardman regarding the February 27, 1997 "informational meeting" sponsored by local village officials, New York State Senator Spano and Assemblyman Brodsky wherein he states in part that "…most of the controversy has been caused by Mr. Michael Foley, the owner of an Amoco gas station in the village" Furthermore, Bauman clearly indicates that the meeting itself was obviously prejudiced against the project as the agenda handed to every attendee stated that the meeting concerned the "Megaplex Proposal." Based on the untruths in the information disseminated by Michael Foley, residents and local business people became concerned about the dangers of new gas tanks exploding or polluting their water supply; the alleged possible effluent from the four new bathrooms overwhelming the county's sewer system; the possibility of lights from the stations casting a glow over the surrounding areas of the Village at night; and advertising signs destroying the aesthetics of the Parkway. All of these concerns were products of false information provided by Michael Foley and were refuted at the meeting. [See Exhibit "8" attached hereto]

70. Bauman also commented about the claim raised by both the local village officials and both state legislators that

there was no notice to the community. As stated in the March 19, 1997 memorandum:

> "...the second question is more troubling and was not responded to adequately; namely, the question of notice to the community. Unfortunately, more than six years have past since the advertisement for an RFP for the disposition of the stations and both mayors and the residents claim that they were unaware of the project. After further research of our files following the meeting, this claim is untrue.
>
> The region is in the process of rehabilitating bridges on the Saw Mill River Parkway. The limits of this project extend to the area of the gas stations and during the development of the rehabilitation projects, meetings were held in the Village of Hastings-on-Hudson with village officials and local residents. While the focus of the meetings was the rehabilitation of the bridges, one of my engineers made a presentation at the August 9, 1994 meeting to Village Manager N. Hess, three village trustees, and approximately 50 local residents concerning our plans for the northbound and southbound gas stations. Even prior to this meeting, we know that the Village was fully aware of our plans as evidenced by a December 27, 1993 letter from the Hastings Historical Society which stated that the Society was very pleased to learn that the department was seriously considering restoring the two gas stations...
>
> It appears that Village officials and many residents now have selective memory concerning their involvement with the proposed gas stations."

[See Exhibit "8" attached hereto]

71. Bauman's memorandum to defendant Boardman stated that "...it is essential that the Department either move forward with the project or, with the concurrence of the State Historical Preservation Officer, demolish the two buildings immediately."

72. The issue of "who knew what and when?" was also raised in a Gannett newspaper article by Sean Webby entitled "State DOT official: Hastings Knew of Plans for Parkway Gas Stations" and in said article, Bauman is quoted as saying "...I'd rather not address motives but it was well known throughout the village that those gas stations were being opened...they knew it." [See Exhibit "9" attached hereto]

73. As a direct result of both public and local political pressure, Bauman abruptly reversed his position and put "on hold" the State of New York's contract with the claimant to restore and reopen the two service stations on the Saw Mill Parkway. [See March 19, 1997 Gannett Newspaper Article entitled "DOT, Hastings officials at odds over reopening of gas stations" attached hereto as Exhibit "10"]

74. One month later, in an internal Department memorandum dated April 24, 1997, the following comments were made concerning the Barrier project: "...had two conversations w/ Kate Burgess - Special Assistant to Commissioner. Last Wednesday Kate inquired about the collateral assignment. She

is putting together a position for Commissioner. Main Office has received a lot of letters in support of stations. Burgess will probably recommend implementation of lease. Timetable is unknown. Jeffers has been in contact with Kate Burgess. According to Barrier, Burgess is to submit report on Friday. [Burgess has been given 'buyout numbers']" [See Exhibit "11" attached hereto]

75. Richard Morris, Real Estate Director for the New York State Department of Transportation later confirmed during a formal deposition that the monetary figure ["buyout number"] which had been calculated by the Department to estimate the State's liability for breaching the leases was approximately One Million [$1,000,000.00] Dollars per side. [See pg. 19 of Transcript of Richard Morris attached hereto as Exhibit "12"]

76. On or about May 14, 1997, the Department [pursuant to Boardman's directive] breached its leases with the plaintiff based solely on public and political pressure. The termination of said leases was not made pursuant to Paragraph "25" of the same – which mandated written notification – for a Department of Transportation official telephoned plaintiff to notify it that the Department of Transportation had unilaterally terminated both leases.

77. The termination of said leases was made directly by Commissioner Boardman [See Examination Before Trial Transcript of Albert J. Bauman, former Regional Director of the New York

Department of Transportation, pg. 61, attached hereto as Exhibit "7"]

78. Immediately following the termination, it was reported in a Gannet newspaper that Bauman was quoted to have said: "…We were going to provide a service for the people who travel on the parkway, but the local community spoke out loudly that they did not want it there… therefore, we are not going to proceed." [See May 14, 1997 Gannett Newspaper Article entitled "State Cancels its Plans for Saw Mill Gas Stations" attached hereto as Exhibit "13"]

79. On or about May 29, 1997, New York State Senator Nicholas Spano stated in a letter to Anthony Tarricone – a competitor of Barrier – of Hastings on Hudson, New York, "…As you know, Assemblyman Brodsky and I held an informational meeting as Hastings Village Hall back in February to discuss the issue. Mayor Kinnally and more than 200 residents came out to attend the meeting, as did DOT and Department of Environmental Conservation [DEC] officers… I firmly believe that the residents of Hastings deserve much of the credit for putting a halt to the proposal – especially those who made their opinions known at the February meeting" [See Exhibit "14" attached hereto].

80. The New York Department of Transportation continued to bill and plaintiff continued to pay the sum of $500.00 per month per lease under the terms of the aforesaid until **[date]**.

81. The decision by the Department to breach its leases with the plaintiff and deny plaintiff his right under the leases to develop, operate and maintain parkway service stations with restroom facilities for the sale of gasoline, diesel fuel, and service station related convenience items, is arbitrary and capricious due to the fact that the State's decision was based upon the generalized complaints lodged by a vocal minority of citizens, local public officials at public meetings and New York State officials and, was designed as a pretext to assuage the unfounded opposition of said citizens. [See Examination Before Trial Transcript of Albert J. Bauman, former Regional Director of the New York Department of Transportation, pgs. 77-80, attached hereto as Exhibit "7"]

82. While the rights of the citizens to petition their government – in this case the Department – is a fundamental right under the Constitution, the State is legally bound to strict adherence to the existing constitutional and statutory mandates in rendering its decisions and implementing its policies.

83. The anticipated monthly profit for both service stations would have been between $75,000.00 and $100,000.00 per month; therefore, the present value of lost profit over the 30 year term of the lease ranges between $27,500,000.00 and $36,000,000.00.

84. To date, plaintiff has remitted over $50,000.00 to